**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DANIEL GEBHARDT,

        *Plaintiff,*

                        CASE NO. 2:20-cv-11742

*v.*

                        DISTRICT JUDGE TERRENCE G. BERG

LYNN M. LARSON,
BARBOUR,                  MAGISTRATE JUDGE PATRICIA T.
                        MORRIS

        *Defendants.*

_____/

**REPORT AND RECOMMENDATION ON DEFENDANT BARBOUR's**
**MOTION FOR SUMMARY JUDGMENT (ECF No. 41)**

**I.**    **RECOMMENDATION**

For the following reasons, **I RECOMMEND** that this Court **GRANT** Defendant

Barbour's motion for summary judgement (ECF No. 41).

**II.**    **REPORT**

    **A. Background**

Daniel Gebhardt is a prisoner in the custody of the Michigan Department of

Corrections ("MDOC").  (ECF No. 22, PageID.116, ¶ 5).  Sometime in March 2018,

Gebhardt was admitted to the Duane Waters Hospital ("DWH"), a hospital operated by the

MDOC to provide prisoners with medical care beyond the capabilities of the MDOC's

prisons.  (*See id.* at PageID.116, 121, ¶¶ 7, 39–43).  Martine Barbour, a registered nurse,

cared for Gebhardt while he was housed at DWH.  (*Id.* at PageID.116, 121, ¶ 8, 44).

1

Gebhardt and Barbour had an antagonistic relationship.  On March 23, for example, Barbour and another Nurse at DWH brought Gebhardt his pain medication.  (ECF No. 41-3, PageID.353).  While handing Gebhardt his medication, Barbour yelled to a group of staff members down the hall that she had to bring another nurse with her because Gebhardt would "snatch" medication cups from her.  (*Id.* at PageID.353–54).  Apparently, Gebhardt found this comment to be "obnoxious," and he submitted a formal grievance later that day.  (*Id.* at PageID.351, 353).

The MDOC provides a three-step, internal process for prisoners to raise formal complaints.  (ECF No. 41-2, PageID.331–33).  At step one, a prisoner must "attempt to resolve the issue with the staff member involved within two business days" and, if unsuccessful, must file a grievance within five business days.  (*Id.* at PageID.330–31).  If the inmate is dissatisfied with the disposition of the step one grievance, or does not receive a response ten days after the due date, then he or she may file a step two grievance using the appropriate form.  (*Id.* at PageID.332).  Similarly, if the inmate is dissatisfied with the step two response or does not receive a response for ten days after the response was due, he or she has ten days to file a step three grievance.  (*Id.* at PageID.333).

After receiving Gebhardt's grievance, the MDOC's designated respondent, a nurse at DWH, replied to Gebhardt, telling him that someone "spoke[]" with Barbour and that Barbour would "continue to behave professionally at all times."  (*See* ECF No. 41-3, PageID.353–54).  Despite being asked to behave professionally, Barbour continued to "belittle" Gebhardt.  (*Id.* at PageID.351).

Just four days after Gebhardt submitted his step one grievance, Gebhardt alleges he told Barbour that he "was in extreme pain" and that he "needed" medication.  (ECF No. 22, PageID.121, ¶¶ 44–45).  However, Barbour declined to provide Gebhardt with any pain medication, and she neglected to "put [Gebhardt's] request in [his] medical chart."  (*Id.* at PageID.121, ¶ 45).

Later that day, Gebhardt's physician diagnosed him with a pulmonary embolism, and just a day later, Gebhardt "became dizzy and collapsed."  (*Id.* at PageID.121–22, ¶¶ 46–47).  For several days after he collapsed, Gebhardt remained dizzy, was in "excruciating pain," and developed swelling on the left side of his chest.  (*Id.* at PageID.122–23, ¶¶ 50, 52, 56).  Yet, Gebhardt's physician ordered that he be returned to his prison on April 4. (*Id.* at PageID.122, ¶ 55, 60).

Less than one day after returning to prison, Gebhardt began "internal[ly] bleeding" and had to be admitted to the Henry Ford Hospital before eventually transferring back to DWH.  (*Id.* at PageID.123, ¶¶ 62–63).  After he arrived at DWH, Barbour told Gebhardt that he should have remained at DWH, and that the only reason his physician transferred him was because he "wrote a grievance" against Barbour.   (*Id.* at PageID.124, ¶ 65).  A couple of weeks later, Gebhardt complained to Barbour that he had a "'shooting' pain radiating throughout his stomach" and pain while urinating; however, Barbour declined to provide any medical assistance.  (*Id.* at PageID.124, ¶ 68).

Dissatisfied with Barbour's medical care, Gebhardt named her in his amended complaint, apparently bringing a claim under 42 U.S.C. § 1983, alleging that Barbour

violated his Eighth Amendment rights.[1]  (*See id.* at PageID.116, 126–130, ¶¶ 8, 81–93).

Gebhardt's amended complaint only mentions Barbour's remark after he returned from the

prison and the two incidents where Barbour declined to provide him with medical care.

(*Id.* at PageID.121, 124, ¶¶ 44–45, 65, 68).  But although Gebhardt filed six grievances

while incarcerated and pursued each grievance through the final step of the grievance

process, he did not file any grievances related to the events mentioned in his complaint.

(ECF No. 41-3).  Gebhardt did, however, appeal his March 22 grievance concerning

Barbour's "obnoxious" comment through the entire grievance process, submitting a step

two grievance on May 10 and a step three grievance on June 14.  (*Id.* at PageID.351, 353).

In response to Gebhardt's amended complaint, Barbour moved for summary

judgment, arguing that Gebhardt failed to exhaust his administrative remedies.

### B.  Summary Judgment Standard

A court will grant a party's motion for summary judgment when the movant shows

that "no genuine dispute as to any material fact" exists.  Fed. R. Civ. P. 56(a).  In reviewing

the motion, the court must view all facts and inferences in the light most favorable to the

non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986).  The moving party bears "the initial burden of showing the absence of a genuine

issue of material fact as to an essential element of the non-movant's case."  *Street v. J.C.*

*Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Celotex Corp. v. Cartrett*,

477 U.S. 317, 323 (1986)) (internal quotation marks omitted).  In making its determination,

---

[1] Gebhardt also appears to allege that Barbour violated his Fourteenth Amendment rights and he seems to bring a state-law negligence claim against her.  (*Id.* at PageID.131, ¶¶ 94–103).

a court may consider the plausibility of the movant's evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper when the moving party shows that the non-moving party cannot meet its burden of proof. *Celotex*, 477 U.S. at 325.

The non-moving party cannot merely rest on the pleadings in response to a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). The non-movant cannot withhold evidence until trial or rely on speculative possibilities that material issues of fact will appear later. 10B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2739 (3d ed. 1998). "[T]o withstand a properly supported motion for summary judgment, the non-moving party must identify specific facts and affirmative evidence that contradict those offered by the moving party." *Cosmas v. Am. Express Centurion Bank*, 757 F. Supp. 2d 489, 492 (D. N.J. 2010). In doing so, the non-moving party cannot simply assert that the other side's evidence lacks credibility. *Id.* at 493. And while a pro se party's arguments are entitled to liberal construction, "this liberal standard does not . . . 'relieve [the party] of his duty to meet the requirements necessary to defeat a motion for summary judgment.'" *Veloz v. New York*, 339 F. Supp. 2d 505, 513 (S.D.N.Y. 2004) (quoting *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)). "[A] pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

When the non-moving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist. *Street*, 886 F.2d at 1479-80.   The court will rely on the "facts presented and designated by the moving party." *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404 (6th Cir. 1992).   After examining the evidence designated by the parties, the court then determines "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52).   Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

### B.   Discussion

Under the Prison Litigation Reform Act ("PLRA"), prisoners may not bring a § 1983 action against prison officials, challenging the conditions of their confinement, without first exhausting their available administrative remedies.   42 U.S.C. § 1997e(a) (2018); *Porter v. Nussle*, 534 U.S. 516, 523 (2002); *Booth v. Churner*, 532 U.S. 731, 741 (2001).   Prisoners must "properly" exhaust their administrative remedies, meaning that they must "compl[y] with an agency's deadlines and other critical procedural rules . . . ." *Woodford v. Ngo*, 548 U.S. 81, 90, 92 (2006).

There is no serious dispute that Gebhardt did not exhaust any of his claims against Barbour.  Gebhardt's complaint contains just three allegations concerning Barbour: (1) that on March 27, 2018, Barbour denied a request from Gebhardt for medication after Gebhardt

6

told her that he was in "extreme pain"; (2) that on April 10, Barbour told Gebhardt that he had been temporally returned to the prison because he filed a grievance concerning her; and (3) that on April 29, Barbour neglected to provide medical assistance after Gebhardt told her that he had a "'shooting' pain radiating throughout his stomach." (ECF No. 22, PageID.121, 124, ¶¶ 44–45, 65, 68).

Although Gebhardt has filed six grievances, none of these grievances concern the incidents mentioned in this complaint. (*See* ECF No. 41-3). Only one of these grievances mentions Barbour by name; however, this grievance claims that on March 22, while Gebhardt was housed at DWH, Barbour told another hospital employee that Gebhardt would "snatch[]" medication from her, a comment Gebhardt found to be "lude and obnoxious . . . ." (*Id.* at PageID.351–54). Not only does this grievance concern an issue that is completely distinct from those raised in the complaint, but it also predates each incident involving Barbour in Gebhardt's complaint. (*Id.*); *see Jonson v. Blessman*, 2:20-cv-10147, 2022 WL 1055456, at *5 (E.D. Mich. Jan. 26, 2022) (explaining that a prisoner only exhausts those issues which were addressed in his or her grievances), *report & recommendation adopted by* 2022 WL 976969 (E.D. Mich. Mar. 31, 2022); *see also Ford v. Martin*, 49 F. App'x 584, 585 (6th Cir. 2002); *Baldridge-El v. Gundy*, 238 F.3d 419 (6th Cir. 2000).

Of the remaining grievances, only one concerns facts even remotely like those mentioned in Gebhardt's complaint. On March 17, Gebhardt filed a complaint accusing a group of unnamed nurses of withholding his blood thinners. (ECF No. 41-3, PageID.363). But this grievance, too, predates every incident mentioned in the complaint. (*Id.*) And

7

while it shares some similarities with Gebhardt's allegation that Barbour once refused to provide him with medical assistance after he reported stomach pains, the grievance, and this allegation, concern different incidents. (*Compare id.*, *with* ECF No. 22, PageID.124, ¶ 68). Moreover, even if this grievance concerned an event which Gebhardt mentioned in his complaint, the grievance could not serve to exhaust that claim because by neglecting to name Barbour, or any other individual involved in the incident, Gebhardt failed to follow the MDOC's procedures, and therefore did not "properly" exhaust his administrative remedies. *See Johnson*, 2022 WL 1055456, at *4–5.

However, as Gebhardt points out, a prisoner's duty to exhaust his or her administrative remedies prior to filing a complaint in federal court extends only to those remedies that are "available" to the prisoner. *Ross v. Blake*, 578 U.S. 632, 642 (2016). Thus, a prisoner need only exhaust an administrative remedy if it is "'capable of use' to obtain 'some relief for the action complained of.'" *Id.* (quoting *Booth*, 532 U.S. at 732–38).

Gebhardt argues that the MDOC's grievance process was not available to him, and therefore he need not have exhausted this remedy. Specifically, he argues that because MDOC officials failed to adequately resolve his grievance against Barbour, officials proved to be either unable or unwilling to provide relief for any offense Gebhardt might attempt to grieve. (ECF No. 44, PageID.384–85). He also argues that he was thwarted from following the grievance process both because MDOC employees failed to provide him with a copy of the MDOC grievance policy and because Barbour insinuated that he

could not receive care at the hospital if he filed grievances against her. (*See id.* at PageID.385–86). For the following reasons, I suggest that these arguments fail.

### 1.   Whether Prison Officials Were Unwilling or Unable to Remedy Gebhardt's Grievances

Gebhardt first argues that, as evidenced by the MDOC's failure to successfully dissuade Barbour from "belittl[ing]" him following his March 22 Grievance, MDOC employees were either unable or unwilling to provide any relief for any grievable offense. (*Id.* at PageID.384–85).

A remedy cannot be available without the "possibility" for relief—if an administrative procedure "operates as a simple dead end[,] with officers unable or consistently unwilling to provide any relief to aggrieved inmates," then the process is not available. *Ross*, 578 U.S. at 643 (internal quotation marks omitted) (quoting *Booth*, 532 U.S. at 738). But a prisoner's administrative remedies are not unavailable simply because a prisoner has never happened to obtain relief; the prison's failure to afford relief to inmates must be "systemic[]" such that a prisoner could never expect to obtain relief, no matter the circumstance. *Morgan v. Kentucky*, No. 3:17-cv-00474, 2018 WL 715468, at *3 (W.D. Ky. Feb. 5, 2018); *see also Ross*, 578 U.S. at 643 (explaining that an administrative remedy is unavailable where there is no "potential" for relief). For example, if "a prison handbook directs inmates to submit their grievances to a particular administrative office—but in practice that office disclaims the capacity to consider those petitions," then a prisoner could not possibly use this process to obtain relief. *Ross*, 578 U.S. at 643. Likewise, "if

administrative officials have apparent authority, but decline ever to exercise it," then a prisoner could not obtain relief, no matter the merits of his or her grievance. *Id.*

Thus, to survive summary judgment, a prisoner must provide evidence from which a reasonable factfinder could infer that it would be impossible for him or her to obtain relief through the prison's grievance process. *See id.* The mere fact that a particular grievance or set of grievances were denied does not meet this burden if the prison officials were willing to provide relief where appropriate and were capable of doing so. For that reason, the Middle District of Tennessee held that a reasonable juror could not infer that prison officials were unwilling to provide relief to a prisoner from the mere fact that they denied all of his grievances on procedural grounds. *Norris v. Covey*, No. 3:16-cv-02719, 2018 WL 4346697, at *6 (M.D. Tenn. Aug. 20, 2018), *report & recommendation adopted by* 2018 WL 4333793 (M.D. Tenn. 2018). In *Norris*, a prisoner argued that his administrative remedies were not available to him because the prison's repeated and consistent failure to address his grievances on their merits evidenced a "systematic design . . . to deprive" him of the ability to obtain redress. *Id.*

The court disagreed, reasoning that prison officials did not reject his grievances without serious consideration. *Id.* Indeed, prison officials considered each grievance and reached dispositions that were consistent with the prison's "established grievance procedures." *Id.* For example, officials rejected the one of the grievances because the prisoner did not provide "specific details" such as "dates, times [and the names" of persons involved as mandated" by the grievance policy. *Id.* In another grievance, the prisoner "address[ed] multiple issues," again, in contravention of "established" policy. *Id.* Because

officials seriously considered each grievance and provided legitimate reasons for failing to reach their merits, the court concluded that no reasonable juror could find that officials were "unwilling" to afford relief.  *Id.*; *see also Craig v. Kizziah*, No. 6:19-cv-63-CHB, 2019 WL 5790958, at *1 (E.D. Ky. Nov. 6, 2019) ("[E]ven if the defendants themselves were unwilling to provide [plaintiff] with any relief, [plaintiff] does not allege that the administrative process on the whole . . . would be futile."); *Baxter v. Corizon Health, Inc.*, No. 14-1347-JDT-cgc, 2018 WL 4489464, at *5–6 (W.D. Tenn. Sept. 19, 2018).

So too, here, prison officials seriously considered each grievance and provided responses that were consistent with the MDOC's policies.  Indeed, prison officials responded to each step one grievance on its merits and either provided remedies or detailed why they believed remedies were not necessary.  (ECF No. 41-3).  In one grievance, for example, Gebhardt complained that his doctor would not discuss his treatment plan with him, and he requested "24/7" care under the supervision of a more "competent" physician. (*Id.* at PageID.368).  Officials investigated Gebhardt's complaint and responded that his doctor did in fact discuss "a plan of care with [Gebhardt]" and his family.  (*Id.* at PageID.369).  While officials disagreed that it was necessary for Gebhardt to be constantly supervised by a physician, they noted that his current doctor had planned a "follow up CT scan" and an appointment between Gebhardt and an ENT specialist.  (*Id.*)  In another grievance, Gebhardt claimed that after he asked a nurse for a "snack bag," the nurse told him that she did not "give a fuck about [his] snack bag," and made other comments that "belittle[d]" Gebhardt.  (*Id.* at PageID.358).  An official interviewed the nurse, who denied making these comments, and rather than take the nurse at her word, the official interviewed

11

a witness who corroborated the nurse's version of events.  (*Id.* at PageID.359).  Based on this investigation, the official concluded that no action was necessary.  (*Id.*)  Given the MDOC's thorough and diligent responses to each of Gebhardt's grievances, a reasonable juror could not infer that officials were neither willing nor able to remedy Gebhardt's grievances.

Further, the mere fact that officials did not successfully resolve Gebhardt's grievance concerning Barbour's "obnoxious" comments does not indicate that prison officials could not remedy any other grievance that Gebhardt might file.  (*Id.* at PageID.351).  Although prison officials may have failed to prevent Barbour's offensive comments towards Gebhardt, this says little about their ability to resolve other issues, such as Barbour's refusal to provide medical treatment on April 29.  Nor does the official's decision to "sp[eak] with" Barbour, rather than "reprimand[]" her, suggest that they were "unwilling" to provide a remedy.  (*See* ECF No. 45, PageID.407).  Quite the opposite, it demonstrates that that prison officials were willing and able to provide some sort of remedy, even if it was not the exact remedy Gebhardt would have preferred.  *See Booth*, 532 U.S. at 739 (explaining that exhaustion is required "regardless of the fit between a prisoner's prayer for relief and the administrative remedies possible.").

At best, Gebhardt argues that it would be unlikely for prison officials to deny six grievances if they were truly willing to afford any relief, and for that reason, a factfinder could infer that prison officials were not willing to provide any remedies.  (*See* ECF No. 45, PageID.406–07).  However, I suggest that considering officials' detailed responses to Gebhardt's grievances, and their occasional efforts to provide at least some relief, the fact

that Gebhardt filed six unsuccessful grievances, without more, is not enough for a reasonable juror to conclude that prison officials were systemically unwilling or unable to afford any relief. *Cf. Craig*, 2019 WL 5790958, at *2 ("[A]n inmate's repeated use of the Bureau of Prison's administrative remedy procedures demonstrates the remedy process was not a dead end."); *Blissit v. Fiquiris*, 345 F. Supp. 3d 931, 940 (S.D. Oh. 2018); *Norris*, 2018 WL 4346697, at *6.

### 2.    Whether Prison Officials Thwarted Gebhardt from Accessing the Grievance Process

In *Ross v. Blake*, the Supreme Court explained that administrative remedies may be unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." 578 U.S. at 644. Both procedural systems designed "to 'trip[] up all but the most skillful prisoners'" and misleading or threatening statements can "prevent" inmates from utilizing the prisons procedures. *Id.* (quoting *Woodford*, 548 U.S. at 102). And where prisoners cannot access the prison's administrative remedies, this sort of interference "renders the administrative process unavailable." *Id.*

Gebhardt argues that prison officials thwarted him from utilizing the prison's grievance procedures in two ways. First, Gebhardt asserts that he could not follow the MDOC's grievance procedures because prison officials never provided him with a copy of the grievance policy. (ECF No. 45, PageID.407). And second, Gebhardt argues that Barbour "dissuad[ed]" him from filing additional grievances against her by telling him that he was released from the hospital for naming her in a grievance. (*Id.* at PageID.407–08).

### a. Withheld Grievance Policy

One way in which prison officials may thwart inmates from complying with grievance procedures is by withholding the materials that a prisoner needs to properly exhaust his or her claims. *Dale v. Lappin*, 376 F.3d 652, 656 (7th Cir. 2004); *Mitchell v. Horn*, 318 F.3d 523, 529 (3d Cir. 2003); *Miller v. Norris*, 247 F.3d 736, 740 (8th Cir. 2001); *Tilman v. City of St. Louis, Mo.*, No. 21-299, 2021 WL 981859, at *3–4 (E.D. Mo. Mar. 16, 2021); *Hunt v. Carver*, No. 1:19-00356, 2020 WL 9348170, at *8 (S.D. W. Va. Nov. 25, 2020).   And a copy of a prison's grievance procedures and policies may be a material that a prisoner needs to properly exhaust his or her grievances. *See Brantner v. Freestone Cty. Sheriffs Office*, 776 F. App'x 829, 834 (5th Cir. 2019).

However, a prison's failure to provide a prisoner with access to the rules and procedures for exhaustion only renders exhaustion unavailable if it "prevent[s]" the inmate from utilizing the grievance process. *See Ross*, 578 U.S. at 644.  In *Small v. Camden Cty.*, for example, the Third Circuit held that prison officials did not thwart a prisoner from exhausting his administrative remedies by withholding a handbook on his prison' grievance procedures because the prisoner knew how to follow the prison's grievance procedure even without a handbook.  728 F.3d 265, 271 (3d Cir. 2013).  Although the prisoner had not received a copy of the handbook, he still demonstrated that he knew how to follow the grievance procedure by participating in the grievance process.  Indeed, the Court noted that even without access to the handbook, the prisoner "obtained" and "properly filed his first grievance form . . . ." *Id.* at 272.

14

Several other courts have reached similar conclusions. *See, e.g.*, *Ruggiero v. Cty. of Orange*, 467 F.3d 170, 178 (2d Cir. 2006); *Morris v. Mason*, No. 3:17-CV-41-DPJ-FKB, 2020 WL 636919; 2019 WL 4738896, at *2–3 (S.D. Miss. Feb. 11, 2020); *Hanna v. Bossier Par. Corr. Ctr.*, No. 12-CV-0494, 2014 WL 2807647, at *4 (W.D. La. June 20, 2014).

Similarly, here, Gebhardt fails to demonstrate that he could not navigate the grievance process. Like in *Small*, Gebhardt utilized the grievance process even without the use of a handbook, and he did so six separate times, pursuing each grievance through the final step of the process. (*See* ECF No. 41-3; ECF No. 45-3, PageID.418). It appears that Gebhardt was more than capable of following the grievance process, and his reliance on the help of another prisoner makes no difference: Gebhardt was not "prevent[ed]" from using the MDOC's grievance process. *Ross*, 578 U.S. at 644. Accordingly, I suggest that even if Gebhardt could show that prison officials never supplied him with a copy of the MDOC's exhaustion policy, this would not have thwarted him from exhausting his administrative remedies.

### b.   Whether Barbour's Threat Thwarted Gebhardt from Accessing the Grievance Process

Alternatively, Gebhardt argues that Barbour "dissuad[ed]" him from using the grievance process. (ECF No. 45, PageID.407–08). He claims that after he returned to the hospital on April 10, 2018, Barbour told him that he was temporarily released from the hospital only because he had filed a grievance against her. (*Id.*) The insinuation, according

15

to Gebhardt, was that if Gebhardt filed any more grievances against Barbour, he might be denied necessary medical care at DWH.  (*Id.*)

Even before *Ross*, courts recognized that prison officials can thwart inmates from pursuing their administrative remedies through intimidation or threats.  *Ross*, 578 U.S. at 644 n.3.  However, courts disagree on the correct standard to apply when determining whether an official's threat has thwarted a prisoner from pursuing his other administrative remedies.  *McBride v. Lopez*, 807 F.3d 982, 987 (9th Cir. 2015).  The majority of circuits follow a two-prong test, first established by the Eleventh Circuit, which requires a prisoner to show:

> "(1) the threat [of retaliation] actually did deter the plaintiff inmate from lodging a grievance or pursuing a particular part of the process; and (2) the threat is one that would deter a reasonable inmate of ordinary firmness and fortitude from lodging a grievance or pursuing the part of the grievance process that the inmate failed to exhaust."

*Turner v. Burnside*, 541 F.3d 1077, 1085 (11th Cir. 2008); *see also Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011).  The Second and Seventh Circuits, however, follow a purely "objective" standard, asking only whether "a similarly situated individual of ordinary firmness" would have been deterred by the threat.  *Hemphill v. New York*, 380 F.3d 680, 688 (2d Cir. 2004); *see also Edmeyer v. Brock*, 11 F. 4th 537, 543 (7th Cir. 2021).  Although the Sixth Circuit has not yet addressed this issue in a binding decision, it has issued an unreported decision which tacitly adopted the Eleventh Circuit's two-pronged approach.  *See Pool v. Klenz*, No. 17-3426, 2018 WL 1989637, at *3 (6th Cir. Jan. 17, 2018).

Though many courts have adopted one of these two tests, few have endeavored to rationalize their choice.  This is an unfortunate shortcoming, as the choice between a purely objective test and a two-pronged approach has significant implications for both prisoners and defendants.  Indeed, it appears that the purely objective test is the more plaintiff-friendly standard.  In circuits that follow this approach, a prisoner who chooses to pursue his administrative remedies, despite a threat that would deter most reasonable prisoners, is not penalized if he fails to follow some procedural requirement imposed by the prison.  *See, e.g.*, *Doe v. Barrett*, No. 3:01cv519 (PCD), 2006 WL 3741825, at *5 (D. Conn. Dec. 19, 2006).  His attempt at exhaustion was unnecessary to begin with, and he may proceed with his suit without having properly exhausted his administrative remedies.  *See id.*  However, in circuits that add a subjective standard, prisoners who file grievances, undeterred by a credible and serious threat, must follow all of the prison's procedural rules and properly exhaust their administrative remedies.  *See Tuckel*, 660 F.3d at 1254.  Moreover, the same prisoner likely cannot decide to take the threat seriously later on; once that prisoner ignores the threat and files a grievance, demonstrating that the same threat thwarted him from filing a later grievance, but not an earlier grievance, would almost always be a near impossible task.

Regardless of the policy implications of either approach, I suggest that the Eleventh Circuit's two-pronged test is more consistent with the text of the PLRA and the Supreme Court's decision in *Ross*.  The PLRA provides that "[n]o action shall be brought. . . by a prisoner. . . until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  What this provision implies, is that "the remedies must . . . be 'available' *to*

*the prisoner*" bringing suit.  *Ross*, 578 U.S. at 639 (emphasis added) (quoting 42 U.S.C. §

1997e(a)).  In other words, to determine whether a remedy is "available," a court looks not

to whether the remedy is generally available to the prison population as a whole; the court

looks to whether *the plaintiff* could have exhausted his or her remedies before filing suit.

*See id.*  The Supreme Court has also explained that an "available" remedy is one that is

"capable of use for the accomplishment of a purpose."  *Id.* (internal quotation marks

omitted) (quoting *Booth*, 532 U.S. at 737–38).  Taken as a whole, the Court's discussion

in *Ross* interprets an available remedy as one that is "capable of use" by the plaintiff.

With this understanding of the PLRA, an objective prong provides a necessary

starting point to determine whether a plaintiff could take advantage of a prison's

administrative remedies.  A plaintiff cannot generally be expected to ignore a threat that

would thwart a reasonable prisoner.  Thus, this prong essentially "filters" out "baseless

retaliation claims" while excusing exhaustion for "serious threats."  *Rinaldi v. United

States*, 904 F.3d 257, 268–69 (2018) (internal quotation marks omitted) (quoting *Tuckel*,

660 F.3d at 1254).

But the analysis cannot stop there.  After all, the focus of the court's inquiry is not

on what remedies were available to a reasonable prisoner, it is instead on what the remedies

were available to the *plaintiff*.  *See Ross*, 578 U.S. at 639.  Thus, even where a particular

threat would thwart most prisoners from exhausting their administrative remedies, a

prisoner who proceeds to exhaust his administrative remedies, undeterred by the threat,

proves that he is still "capable of us[ing]" the prison's administrative remedies, even if

other prisoners might not be under like circumstances.  *See id.*  Under a purely objective

18

standard, a court would have to accept the proposition that an administrative remedy can be both "[in]capable of use" and simultaneously used by such an undeterred prisoner. But a plaintiff cannot use a remedy that is incapable of use, and only through a subjective prong can a court avoid this sort of peculiar doublethink.[2]  Accordingly, I suggest that the two-pronged test set forth by the Eleventh Circuit is the appropriate standard for determining whether an official's threat has rendered a prisoner's administrative remedies unavailable.

Under this standard, Gebhardt fails to establish that he was "actually" deterred from utilizing the grievance process under the subjective prong. Even after Barbour threatened him on April, Gebhardt continued to appeal his March 27 grievance against Barbour. (ECF No. 41-3, PageID.351–53).  Indeed, Gebhardt completed a step two grievance on May 10, and a step three grievance sometime later. (*Id.* at PageID.351).  And Gebhardt pulled no punches in his appeals, accusing Barbour of "lude [*sic*] and obnoxious behavior," and requesting that she be "removed from her position . . . ." (*Id.*)  Because Gebhardt was undeterred by Barbour's threat, he cannot now claim that her threat prevented him from filing grievances against her. *See Turner*, 541 F.3d at 1085; *see also Pool*, 2018 WL 1989637, at *3.  Accordingly, because Gebhardt fails to establish that his administrative remedies were unavailable, I suggest that his complaint must be dismissed for failure to exhaust.

## C. Conclusion

---

[2] "*Doublethink* means the power of holding two contradictory beliefs in one's mind simultaneously, and accepting both of them."  George Orwell, 1984 at 214 (1949)

For the reasons discussed above, **I RECOMMEND** that this Court **GRANT** defendants' motions for summary judgement (ECF No. 41) without prejudice.[3]

## III. <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this R&R. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this R&R to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D.

---

[3] *See Bell v. Konteh*, 450 F.3d 651, 653 (6th Cir. 2006) ("[T]he appropriate disposition of an unexhausted claim under the PLRA is dismissal without prejudice.").

Mich. LR 72.1(d).   The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  August 2, 2022                                    S/ PATRICIA T. MORRIS
                                                                         Patricia T. Morris
                                                                         United States Magistrate Judge